UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

WILLIAM BIGGE, KAREN BIGGE,
WAYNE CANFIELD, AND LAURIE
CANFIELD,

                Plaintiffs,

-vs-                          Case No.  5:13-cv-49-Oc-10PRL

DISTRICT SCHOOL BOARD OF
CITRUS COUNTY, FLORIDA,

                Defendant.

_____/

## O R D E R

The Court disposes of this case by granting summary judgment to the School Board on all of the Plaintiffs' claims.

## Background

Plaintiffs William Bigge, Karen Bigge, Wayne Canfield, and Laurie Canfield are the parents of three female former students at Citrus High School.[1]  Between December 2008 and January 2009, while their daughters were students at the school, the Plaintiffs lodged complaints with the Defendant, School Board of Citrus County, Florida ("the School Board") and the Department of Education's Office of Civil Rights, alleging that three male coaches of the Citrus High School Girls' Junior Varsity Soccer Team were creating a gender-based hostile environment by making numerous sexually

_____

[1]The female students, Stacey Bigge, Karen Bigge, and Angelica Seaman, have all graduated from high school and reached the age of majority.

inappropriate comments directed towards their daughters and other female students.[2] The Plaintiffs assert that after they complained, the School Board engaged in a pattern of retaliation against them and their daughters.

In 2011, the daughters filed a complaint in this Court alleging retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX"). See Bigge v. District School Board of Citrus County, Florida, Case No. 5:11-cv-210-Oc-10TBS ("the 2011 case").   The daughters alleged that they were constructively discharged from the soccer team, threatened with a transfer to another high school located in another school district, and that the soccer coaches threatened their parents with a defamation lawsuit.  The Plaintiffs were not parties to that case and did not assert any claims for relief on their own behalf.  That litigation ultimately settled, and judgment dismissing the 2011 case with prejudice was entered on September 17, 2012 (the 2011 case, Doc. 43).

In 2013, the Plaintiffs filed the present case seeking monetary damages on their own behalf for the same purported retaliation by the School Board.  The facts alleged in the complaint in the present case are remarkably similar – indeed nearly identical – to the facts asserted in the 2011 case on behalf of the students.  For example, the Plaintiffs now seek damages for themselves based on the threatened transfer of their

---

[2]Citrus High School is within the geographical boundaries of the School Board of Citrus County.

daughters to another school, and the soccer coaches' threatened defamation lawsuit.[3] The Plaintiffs have each asserted claim of retaliation under Title IX (Doc. 1, Counts I-IV), as well as four state law claims of intentional infliction of emotional distress (Id., Counts V-VIII).

The case is now before the Court for consideration of several motions:  (1) the School Board's Motion to Dismiss Complaint or to Strike Paragraphs (Doc. 6), which the Court has treated as a motion for summary judgment (see Doc. 11); (2) the School Board's Amended Motion to Strike Affidavit of Plaintiff William Bigge (Doc. 41); (3) the School Board's Motion for Partial Summary Judgment on Plaintiffs' Claim that Cease and Desist Letters Constituted Retaliation (Doc. 54); (4) the School Board's Amended Motion for Partial Summary Judgment on Plaintiffs' Claim that Laurie Canfield Was Not Hired for Position at Inverness Primary School Was Retaliation (Doc. 58); and (5) Plaintiffs' Motion to Strike Defendant's Motion for Summary Judgment, or in the Alternative, Plaintiffs' Motion for Leave to Supplement Their Opposition to Defendant's Motion for Summary Judgment (Doc. 81).  Each of the motions have been responded to, (Docs. 32, 42, 64-65, 82) and they are ripe for disposition.

Upon due consideration, and for the reasons discussed below, the Court finds that the Plaintiffs' motion to strike is due to be denied, the School Board's amended

_____

[3]The Plaintiff Laurie Canfield, who at the time was a teacher employed by the School Board, also claims she was retaliated against when the School Board delayed awarding her tenure by one year and denied her a position at another school.

motion to strike William Bigge's affidavit is due to be granted in part, and the School Board is entitled to summary judgment on all claims.

### The Facts

#### A.    The Parties

Stacey Bigge, Kathryn Bigge, and Angelica Seaman were all students at Citrus High School during the 2008-2009 school year.  Stacey Bigge was a sophomore, Kathryn Bigge was a graduating senior, and Angelica Seaman was a freshman. Plaintiffs William Bigge and Karen Bigge are the parents of Stacey and Kathryn, and Plaintiffs Wayne and Laurie Canfield are the parents of Angelica Seaman.  At all relevant times, Mrs. Canfield was an art and social studies teacher at the Academy of Environmental Science, a charter school within the Citrus County School District.

During the Fall of 2008, Stacey Bigge and Angelica Seaman were members of the Citrus High School Girls' Junior Varsity Soccer Team, which practiced almost every school day.   Stacey Bigge and Angelica Seaman became offended by, and uncomfortable because of, the conduct of their three male soccer coaches:  Ryan Foster, Andrew Castorina, and Ethan Eldridge.  These coaches made daily comments of a sexual nature at practice to the members of the soccer team.  The comments included statements about team members' genitalia, physical appearance, sexual touching, and on one occasion, Coach Foster pulled down the pants of a teammate of Stacey and Angelica.

**B.      The Plaintiffs' Complaints and the School's Investigation**

In November 2008, Stacey and Angelica complained to their respective parents about their coaches' conduct.  On December 1, 2008, Mr. Canfield complained to Castorina about his behavior.  On December 2, 2008, Mr. Bigge complained to the School Board that the coaches' conduct violated Stacey Bigge's rights under Title IX.

Coaches Castorina and Eldridge learned of Mr. Bigge's complaint that same day. The two Coaches met with their team on December 3, 2008 and discussed the complaints lodged against them.[4]  Castorina and Eldridge threatened to disband the soccer team, kick the girls "who started the rumors" off the team, stated to the team that they knew which parents complained, and threatened to sue those parents for slander.  Castorina and Eldridge then interrogated Stacey Bigge and Angelica Seaman in front of the team, and attempted to force them to admit that there was no harassment or hostile environment.  The two students became very upset and refused to respond.

Stacey Bigge and Angelica Seaman reported what happened to their parents, and on December 4, 2008, Mr. Bigge filed a second complaint with the School Board, this time complaining of retaliation in violation of Title IX relating to the behavior of Castorina and Eldridge at the December 2, 2008 soccer team meeting.  Mrs. Canfield also filed a complaint of sex discrimination and retaliation with the School Board on

---

[4]The record does not contain any evidence of any purportedly retaliatory conduct on the part of Ryan Foster, and it appears that he was removed as a coach almost immediately after the first complaints were made.

December 4, 2008.  In addition, Mr. Bigge filed a Title IX complaint with the United States Department of Education Office of Civil Rights on December 7, 2008.  Mrs. Canfield subsequently filed a similar complaint with the Department of Education on January 26, 2009.[5]

The School Board investigated these complaints and conducted written and oral interviews of Stacey Bigge and Angelica Seaman, as well as the other members of the junior varsity soccer team.  The School Board found that Castorina made an "inappropriate comment" that "had a demeaning effect on some of the younger players," and the School Board reprimanded Castorina for that conduct.  The School Board also suspended Castorina without pay for the duration of the investigation. However, the School Board ultimately determined that there was no violation of Title IX, and found that no further disciplinary action was warranted.

On December 17, 2008, the School Board's Athletic Director, Victoria Overman, informed the entire soccer team, including Stacey Bigge and Angelica Seaman, of the results of the investigation, and stated that Castornia and Eldridge would continue as coaches (Coach Foster having previously been removed).  Ms. Overman also refused to answer whether the girls who had made the complaints would be punished.  Stacey

_____

[5]The record is not entirely clear, but it appears that all of the administrative complaints filed by the parents, including the 2011 lawsuit, were made by the parents as next friends of the minor daughters.  The parents asserted no claims for themselves until the filing of this case in 2013. Additionally, it is clear that none of the individual coaches have been sued, either in the 2011 case or in this litigation.

Bigge and Angelica Seaman quit the team, feeling that they would be subject to continued harassment and that the school would not protect them.

## C.     The Alleged Retaliation

It is undisputed that as a result of the complaints by the Plaintiffs, relations between the Plaintiffs and Coaches Castorina and Eldridge became hostile.  Simply put, the parents and the coaches did not like each other.  At some point during the course of the School Board's investigation, Castorina and Eldridge hired a private attorney, Karen Gaffney.  On January 28, 2009, Ms. Gaffney sent separate cease and desist letters to Mr. Bigge and Mr. Canfield, placing both of them on notice "that any further libelous, slanderous and/or defamatory comments, statements or writings that you choose to publish with respect to [Castorina and Eldridge] will result in the filing of an immediate action against you for monetary damages resulting from your actions." (Doc. 32, Ex. E, pp. 12-13, 25-26).  The cease and desist letters were addressed to Mr. Bigge and Mr. Canfield only, and do not reference or discuss their spouses.  There is no evidence in the record that either Castorina or Eldridge ever filed a lawsuit against Mr. Bigge or Mr. Canfield.[6]

---

[6]Mrs. Bigge avers in her Affidavit that in October 2011 she was interviewed by a local news station regarding Castorina, and during that interview she alleged that Castorina sexually harassed her daughter, Kathryn Bigge, while she was a student at Citrus High School (Doc. 32, Ex. B, ¶ 11). As a result of that televised interview, Castorina hired a separate attorney, Bernard Dempsey, who sent Mrs. Bigge a cease and desist letter in March 2012 (Id., ¶ 12).  In June 2012, Mr. Dempsey filed a defamation lawsuit against Mrs. Bigge on behalf of Castorina (Id., ¶ 13).  Mr. Bigge corroborates these facts in his Affidavit (Doc. 32, Ex. G, ¶ 16).  Although the Bigges assert that this 2012 cease and desist letter and subsequent lawsuit are part of the School Board's purported

(continued...)

The Plaintiffs contend that Castorina's and Eldridge's actions in hiring a private attorney to send the two cease and desist letters were actually done at the behest and direction of the School Board.   Specifically, the Plaintiffs assert that Leigh Ann Bradshaw, then Principal of Citrus High School, instructed the two coaches to hire an attorney and sue the Plaintiffs for slander and defamation, as part of the School Board's pattern of retaliation against the Plaintiffs.  As support for this assertion, the Plaintiffs have submitted two emails.  The first, dated December 2, 2008, is from Ethan Eldridge to his wife, Natalie Eldridge (Doc. 7, Ex. 1).  The email states, in relevant part, that "Mrs. Bradshaw met with Andrew this morning and . . . .  Mrs. Bradshaw said it would be in his best interest to recontact his lawyer from the ID theft case last year and press slander and [defamation] of character against ALL four.  Gatto, Trick, Bigge, and [Canfield] . . . . cha-ching."  (Id.).[7]  The second email, dated January 26, 2009, is from Anthony Castorina to Ethan Eldridge and states in part:

_____

[6](...continued)

pattern of retaliation against them, this argument fails.  By their own testimony, the Bigges admit that the 2012 cease and desist letter and lawsuit are directly and exclusively related to Mrs. Bigge's October 2011 television interview (and the Plaintiffs have not established or even suggested that a television interview constitutes protected activity under Title IX).  There is also a complete lack of <u>any</u> evidence from which a reasonable jury could infer that the 2012 cease and desist letter and lawsuit are tied in <u>any</u> way to the School Board.  Moreover, the 2012 cease and desist letter and lawsuit occurred more than <u>three years after</u> the Bigges engaged in protected conduct when they complained to the School Board and the Department of Education.  Such a lengthy hiatus is fatal to any argument that the events are directly and causally related to the events of 2009.  The Court will therefore not give the 2012 incidents any further consideration.

[7]The Parties appear to agree that "Andrew" is referring to Castorina.

-8-

Leigh Ann just called me into her office.   Apparently Bigge filed a complaint against the school board with the Office of Civil Rights Complaint.   She asked me to write down which JV players came up or moved down in the past 2 years.   I told her what I knew and made sure to tell her that Bigge said she didn't want to play Varsity before the Trinity game because she didn't like the girls on the team.

She also suggested that Karen call Wes to see if we can use the Office of Civil Rights as ammo against Bigge and Canfield.[8]

There is no evidence in the record that Ms. Bradshaw or anyone else employed by the School Board ever communicated with Attorney Gaffney regarding Castorina or Eldridge; or retained Ms. Gaffney or paid for her legal services in relation to the facts of this case; or directed Ms. Gaffney to draft and/or send the cease and desist letters; or ever suggested to her that she pursue any other legal strategies.[9]   Ms. Bradshaw denies ever making any of these statements to Castorina or Eldridge; denies encouraging either coach to hire an attorney; and denies ever mentioning Ms. Gaffney by name.   (Doc. 54, Ex. E).   Andrew Castorina also testified at his deposition that the decision to hire Ms. Gaffney was made by him, that Ms. Bradshaw did not recommend Ms. Gaffney to him, and that he did not discuss his decision to hire an attorney with Ms. Bradshaw.   (Doc. 54, Ex. B).   At most, Castorina mentioned at some point in time to Ms. Bradshaw that he was meeting with an attorney.   (Id.).   And while Eldridge testified

---

[8]The Parties agree that "Karen" is referring to Ms. Gaffney, and "Wes" is referring to Wes Bradshaw, the School Board's general counsel.

[9]There is evidence that Ms. Gaffney was hired by the School Board on prior occasions to represent the School Board at employee termination proceedings wholly unrelated to this case.

at his deposition that Ms. Bradshaw may have told him to contact the Office of Civil Rights, he does not state whether he heeded that advice.  In any event, whatever statements might have been made by Castorina or Eldridge in this context would be objectionable hearsay with regard to the School Board.

Castorina and Eldridge, however, did not stop at just hiring an attorney.  They apparently discovered that Stacey and Kathryn Bigge were living outside of the geographical school zone for Citrus High School.  On February 5 and 9, 2009, Castorina and Eldridge sent several emails to the School Board and Ms. Bradshaw, notifying them of Stacey and Kathryn Bigge's address and urging them to transfer the students to a high school in Sumter County.  (Doc. 32, Ex. E, pp. 14-17)

The School Board, through its student services department, conducted an investigation, which discovered that the Bigges listed several different addresses as their residence, both within and without the Citrus County school district.  On February 12, 2009, Mr. and Mrs. Bigge contacted Citrus High School by telephone and informed the School that they resided at 5222 East Live Oak Drive, Inverness, Florida, which is within the geographical zone for Citrus High School.  This information was passed on to Ms. Bradshaw via email on February 12, 2009.    (Doc. 32, Ex. E, p. 21).  Ms. Bradshaw forwarded this information on to Richard Hilgert in student services, who suggested that the Bigges verify their address with a utility bill or similar proof.  (Id., p. 22).  It does not appear that any further verification was made, because the next day, February 13, 2009, Ms. Bradshaw wrote to Mr. Bigge informing him that they were

living outside of the Citrus County School District, and that both Stacey and Kathryn Bigge were to be transferred to the Sumter County School District effective February 19, 2009.  (Id., p. 23).

This transfer never took place, however.  On February 17, 2009 Mr. Bigge provided the School Board with proof in the form of a rental lease that both Stacey and Kathryn Bigge resided within the geographic district covered by Citrus County schools. Neither student was ever transferred to another school district, and did not miss a single day of school at Citrus High School.

**D.**     **Laurie Canfield's Additional Claim of Retaliation**

Mrs. Canfield began working at the Academy of Environmental Science, a public charter school in the Citrus County School District, in August 2006.  For the 2006-2007 school year she worked part time, three quarters of a full day, teaching art and world geography to students in the ninth grade.  Mrs. Canfield worked full time for the school, teaching the same courses, during the 2007-2008 school year.  She took leave from work for the last six weeks of the 2007-2008 school year for the birth of her son.  When she returned to work in August 2008 for the 2008-2009 school year, Mrs. Canfield worked half time, again teaching art and world geography.

Throughout her employment at the Academy, her supervisor was Ben Stofcheck, the principal of the Academy.  Mr. Stofcheck is responsible for recommending teachers for tenure and/or professional services contracts, and the School Board approves the

recommendations.  For the first three years Mrs. Canfield taught at the Academy, she was employed on a renewable, annual contract.  At the end of the 2008-2009 school year, Mr. Stofcheck recommended that Mrs. Canfield be employed on another annual contract, instead of recommending her for tenure and/or a long-term professional services contract.[10]  Mrs. Canfield testified at deposition that Mr. Stofcheck would not give her a reason for not recommending her for tenure and/or the professional services contract at that time.  (Doc. 7, Ex. 3, p. 31).  However, at the end of the very next school year, June 2010, Mr. Stofcheck recommended Mrs. Canfield for a professional services contract and tenure, and she received both.  (Id., p. 37).

Mrs. Canfield believes that the one year delay in receiving tenure and a professional services contract was in retaliation for her complaints concerning Casotrina and Eldridge.  However, she testified at her deposition that she never complained to Mr. Stofcheck or anyone else at the Academy about the issues involving her daughter's participation in the soccer program at Citrus High School, (Doc. 7, Ex. 3, pp. 29-30),[11] and the record is devoid of any evidence that Mr. Stofcheck was aware that Mrs. Canfield had lodged any complaints.  Moreover, it is undisputed that the first time Mr. Stofcheck recommended Mrs. Canfield for tenure, the School Board approved

---

[10] The Parties refer to the terms tenure and professional services contract interchangeably, and without explanation.

[11]This deposition testimony is from the 2011 case.  Both Parties have submitted deposition excerpts from the 2011 case, and no one has objected to their use or questioned their admissibility in this case.

the recommendation and Mrs. Canfield received tenure.  (Id., pp. 37, 39).  In addition, Mrs. Canfield has not presented any evidence that the one year delay in receiving her professional services contract resulted in any change in her income, or delay in any pay raises or other benefits.  (Id., pp. 52-53).[12]

In January 2010, Mrs. Canfield applied for an art teacher position at Inverness Primary School, which is part of the Citrus County School District.  She interviewed for the position but was not offered the job.  Instead, the position was offered to Holly Herndon, a woman with over nine and half years of full time teaching experience, including five years teaching art at another elementary school, and two years teaching at Inverness Primary School.  (Doc. 58, Ex. D).  In contrast, at the time Mrs. Canfield applied for the art teacher position, she had only taught full time for one school year.

Mrs. Canfield testified at her deposition that she believed she was denied the art teacher position in retaliation for her and her husband's complaints concerning the Citrus High School soccer program.  (Doc. 58, Ex. B, p. 25).  Specifically, she testified that her friend, who was a member of the interview committee, told her that another member of the committee told Marlise Bushman, the person with final hiring authority, not to hire Mrs. Canfield "because her husband is an asshole and they started all that trouble with the soccer team."  (Id.).  Ms. Bushman denies that any such statements

_____

[12]Mrs. Canfield relies on the affidavit of William Bigge (Doc. 32, Ex. G) as proof that the denial of tenure was in retaliation for the complaints about Castorina and Eldridge.  However, as discussed *infra*, the portions of the affidavit Mrs. Canfield relies upon are classic inadmissible hearsay, and have been stricken.

were ever made, and instead insisted that she chose Ms. Herndon for the position based on her qualifications and experience.  (Doc. 58, Ex. E, ¶¶ 5-9).

## Procedural History

Several months after their daughters' lawsuit settled, the Plaintiffs filed this suit in the form of an eight-count Complaint against the School Board alleging four counts of retaliation in violation of Title IX (Doc. 1, Counts I-IV), and four counts of intentional infliction of emotional distress under Florida law (Doc. 1, Counts V-VIII).  The School Board moved to dismiss the Complaint in its entirety (Doc. 6); however, the motion to dismiss included numerous exhibits, depositions, and other extrinsic evidence.  As such, the Court converted the motion into a motion for summary judgment, and afforded the Plaintiffs an opportunity to conduct discovery before responding (Docs. 11, 16).  The Plaintiffs ultimately filed their response (Doc. 32), and the School Board subsequently filed two motions for partial summary judgment relating to the cease and desist letters (Doc. 54), and Mrs. Canfield's failure to receive the art teacher position (Doc. 58).  The School Board also moved to strike the affidavit of William Bigge, which the Plaintiffs filed in support of their summary judgment opposition brief (Doc. 41).  The Plaintiffs also filed separate responses to the School Board's motions for partial summary judgment, and motion to strike (Docs. 42, 64-65).

Before the Court could rule on the motions, the Plaintiffs moved for leave of court to dismiss the four intentional infliction of emotional distress claims (Doc. 37).  The

-14-

Court granted the motion (Doc. 39), leaving pending only the four Title IX retaliation claims.

The Plaintiffs then moved to stay the case pending disclosure of various public records (Doc. 73).  The Plaintiffs were seeking disclosure of transcribed attorney-client privileged communications between David Delaney, the lawyer who represented the School Board in the 2011 case (and the same lawyer representing the School Board in the present case) and members of the School Board.   The Plaintiffs requested a stay of this case until their petition for writ of mandamus filed with the Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida had been ruled upon. (Doc. 73, Ex. A).  The Court granted the motion and stayed the case for 45 days (Doc. 80).[13]

While the case was stayed, the Plaintiffs prevailed on their mandamus petition and obtained the transcripts of the attorney-client privileged communications.[14]  Based

_____

[13]While normally attorney-client privileged communications are not transcribed, much less discoverable, in this instance, because the School Board is a state agency, the communications were classified as "shade sessions" governed by Florida's Sunshine law.  Florida Statute §286.011(8) provides that any board or commission of a state agency may meet in private with the entity's attorney to discuss pending litigation to which the entity is presently a party, so long as the subject of the meeting is confined to settlement negotiations or strategy sessions related to litigation expenditures.  The entire closed-door meeting must be recorded by a certified court reporter, the record must be transcribed, and the transcript shall be made part of the public record upon conclusion of the litigation.  Fla. Stat. § 286.011(8)(a)-(e).

[14]The state court determined that transcripts of two "shade sessions" that took place on January 10, 2012 and June 12, 2012 between Mr. Delaney and the School Board (Doc. 81, Exs. A, M), were now part of the public record pursuant to Florida's Sunshine law and Fla. Stat. § 286.011(8)(e) because the 2011 case had been concluded via settlement.  While sympathetic to the School Board's plight – namely that these transcripts provided a road map of the School Board's litigation strategy – the state court determined that Florida law was unambiguous and did
(continued...)

on the content of these communications, the Plaintiffs filed a motion to strike the School

Board's motion for summary judgment (Doc. 81), claiming that the School Board had

committed fraud upon the Court and acted in a scandalous manner.  The School Board

has responded to the motion to strike (Doc. 82), and it, along with the other pending

motions, are now ripe for consideration.

### The Plaintiffs' Motion to Strike (Doc. 81)

Before the Court can address the motions for summary judgment, the Court must

first address the Plaintiffs' motion to strike.  The Plaintiffs seek to strike the School

Board's motion for summary judgment relating to the cease and desist letters and

attempted transfer of Kathryn and Stacey Bigge to another school on the basis that "the

Defendant, via their agents and employees, and their attorney have committed fraud

on the court and behaved scandalously."  (Doc. 81, p. 1).  The Plaintiffs repeat this

dangerous assertion in their "certificate of good faith conference section," stating:

> In light of the nature of the instant motion, past discussions with
> Defendant's attorney, and the School Board's past and current fraudulent
> actions, any attempt to confer with the Defendant in an effort to resolve
> the issues contained in the instant motion would not only be futile, but
> inappropriate as well.  Furthermore, Plaintiffs' counsel has a duty to bring
> forth evidence of fraud to the Court's attention.

(Id., p. 6).

---

[14](...continued)
not provide for any continuation disclosure exemption for subsequent derivative lawsuits.  (Doc.
84-1).

The Plaintiffs' argument goes like this:  the School Board has argued throughout this litigation that Castorina and Eldridge were not acting under the School Board's direction when they personally hired a private attorney who sent the January 28, 2009 cease and desist letters.  However, the Plaintiffs point to the transcript from the June 12, 2012 shade session in the 2011 case, which contains a discussion between Attorney Delaney and the School Board members about the December 2, 2008 email from Eldridge to his wife and the January 26, 2009 email from Castorina to Eldridge, and how a jury could potentially interpret these emails at trial if they were admitted into evidence (Doc. 81, Ex. A).  According to the Plaintiffs, this attorney-client discussion of litigation strategy – and in particular the statements by Mr. Delaney describing the emails – actually constitute evidence and proof that the School Board in fact directed Castorina and Eldridge to hire a private attorney to send the two cease and desist letters to Mr. Bigge and Mr. Canfield as part of the School Board's pattern of retaliation.  See Doc. 81, pp. 2-3.

This argument, which is unsupported by any legal authority, runs afoul of the rules of evidence and, furthermore, the "evidence" the Plaintiffs rely upon does not support their contentions in any event.[15]

_____

[15]Plaintiffs' counsel, in her briefs and other papers, repeatedly refers to what she characterizes as fraudulent and/or scandalous behavior on the part of the School Board and opposing counsel. See, e.g., Doc. 81, p. 1 ("[T]he Defendant, via their agents and employees, and their attorney have committed fraud on the court and behaved scandalously."); Doc. 81, p. 3 ("The fact that David Delaney and the School Board acknowledged that these emails tied the School
(continued...)

To begin, the entirety of the June 12, 2012 transcript is a discussion of litigation strategy between counsel and his client. It is a roadmap to the School Board's defense of the 2011 case – where the issues and facts were largely identical to the present action. It is, therefore, a classic example of material protected by the attorney-client privilege,[16] and the privilege was not lost merely because the state court subsequently ordered its production under the state's public records law.[17]

Second, there is nothing in the entire 47-page transcript that a reasonable jury could reasonably interpret as an admission by the School Board that anyone affiliated with that entity directed Castorina or Eldridge to hire an attorney, and/or to have that private attorney draft and mail two cease and desist letters, in retaliation for the Plaintiffs' complaints. To the contrary, the June 12, 2012 transcript contains the mental impressions of the School Board's counsel, including an evaluation of the strengths and

---

[15](...continued)

Board into the act of Casotrina and Eldridge retaining a lawyer to threaten a lawsuit yet have always maintained to the Court that Castorina and Eldridge acted independently is fraudulent and scandalous."). Allegations of fraud and scandalous conduct, especially on the part of another lawyer, is a very serious matter and should not be made unless supported by clear and convincing evidence. Here, there is no such evidence, and Plaintiffs' counsel comes dangerously close to engaging in sanctionable behavior under the Rules of Professional Conduct. See Fla. Bar Rule 4-8.4(d) ("A lawyer shall not . . . engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, . . . or other lawyers on any basis. . . .").

[16]See Fed. R. Evid. 501. Accord, Fla. Stat. § 90.502 (2014). In this case, with the dismissal of the state law claims, the rule of decision is supplied by federal law and Rule 501 applies to evidentiary issues.

[17]The forced disclosure of the transcript of the "shade session" of the School Board does not constitute a waiver of the privilege. See Fed. R. Evid. 502(c)(1) and (2) and (d).

weaknesses of each side's positions.[18]  All this transcript establishes is that the School Board was aware of the emails – a fact that has never been disputed (indeed the School Board has referenced these emails in two of its summary judgment motions) – and that the emails could possibly be interpreted by a jury in a way that would not be beneficial to the School Board's defense.  There is nothing in the transcript that could be considered as a fraud upon the Court under even the broadest interpretation of that term.

In addition, the mental impressions of the School Board's counsel in the 2011 case are work product and are simply not admissible.  The School Board's attorney's statements are not evidence – Mr. Delaney is not a witness in this case[19] – and the Court will not transform an attorney's discussion of legal strategy and the weight of the evidence into statements that can be attributed to the School Board as admissions of fact.  Indeed, the Court notes that the Plaintiffs have not cited to any legal authority which would even suggest that a client could be bound by its attorney's discussion of litigation strategy, and/or that such discussion would be considered an admission of fact.  And even though these transcripts have been deemed public records, they are replete with statements constituting inadmissible hearsay within hearsay within

---

[18]For example, at one point Mr. Delaney opines that Ms. Bradshaw – who denies ever talking to Castorina or Eldridge about hiring an attorney or pursuing a defamation lawsuit – would present as a credible witness, and that her version of events would trump the two emails, assuming they are admissible.  (Doc. 81, Ex. A, pp. 20-22).

[19]See, e.g., Fla. Bar Rule of Professional Conduct 4-3.7.

hearsay:  an attorney's discussion of two private individuals' emails that describe a conversation with a third person which the Plaintiffs seek to use as proof of the matters asserted.  See Fed. R. Evid. 801(c).  Moreover, to the extent these transcripts could arguably be shown to fall within a hearsay exception, any probative value that could be attributed to them would be far outweighed by their potential prejudice, again rendering them inadmissible at trial.  See Fed. R. Evid. 401, 403.

The Plaintiffs also cite to an earlier shade session transcript, dated January 10, 2012, as support for a second argument that the School Board and its counsel also committed fraud on the Court by lying in its summary judgment motions that the threatened transfer of Stacey and Kathryn Bigge to a Sumter County school was not retaliatory.  Specifically, the Plaintiffs claim that Mr. Delaney's mental impressions concerning the emails by and between Castorina, Eldridge, Ms. Bradshaw, and the student services department demonstrate as fact that the threatened transfer was part of "an expansive secret campaign to get rid of the Bigge 'mess' which was spear-headed by none other than the coaches being complained about." (Doc. 81, pp. 3-4). The Plaintiffs' attempt to rely upon this January 10, 2012 shade session transcript fails for the same reasons discussed above.  Simply put, the transcript does not support any theory that the School Board's behavior was retaliatory.[20]  The transcript is not a factual

_____

[20]For example, the Plaintiffs cite to pages 37-38 of the shade session transcript as proof that "Coaches Castorina and Eldridge were on a witch hunt to get rid of the Bigges and they did so with the backing, coordination, and cooperation with various members of the School Board." (continued...)

admission by the School Board, but is merely a recitation of the mental impressions and litigation strategy of the School Board's lawyer.  Such mental impressions are not admissible, and are replete with hearsay statements.

For these reasons, the Plaintiffs' motion to strike (Doc. 81) will be denied.  The Plaintiffs are admonished to refrain from making any further disparaging and unprofessional comments about the Defendant and/or its counsel.[21]

### The School Board's Motions for Summary Judgment

The Complaint and the record evidence distill four incidents of purported retaliation against the Plaintiffs:  (1) the January 28, 2009 cease and desist letters from Castorina and Eldridge's private attorney to Mr. Bigge and Mr. Canfield; (2) the February 13, 2009 letter from Ms. Bradshaw to Mr. Bigge notifying him that his children were being transferred to a high school in Sumter County; (3) the one-year delay in awarding Mrs. Canfield tenure and/or a professional services contract; and (4) Mrs.

---

[20](...continued)
(Doc. 81, p. 3, Ex. M, pp. 37-38).  However, a review of these pages of the transcript show that Mr. Delaney is informing the School Board that a jury <u>could</u> interpret the coaches' behavior as a witch hunt, but that Mr. Delaney believes that the School Board's response was appropriate and does not show any retaliatory motive.

[21]The Plaintiffs alternatively ask for leave to supplement their response in opposition to the School Board's summary judgment motions.  This request is due to be denied for several reasons. First, the Plaintiffs have not specified what issues they wish to supplement.  Second, the Plaintiffs spend a large portion of the motion to strike arguing the facts of the case – in other words the Plaintiffs have already supplemented their response through the motion to strike.  In addition, the Plaintiffs have attached 200 pages of exhibits to their motion to strike, which the Court has already taken into consideration.  The Plaintiffs have fully litigated this case, and any further briefing on any of the pending motions would only serve to unnecessarily burden the record.

Canfield's failure to receive the art teacher position at Inverness Primary School.  <u>See</u> <u>also</u> Doc. 32, pp. 3, 6-7.  The School Board has moved for summary judgment as to all four incidents.

## A.    The Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying this standard, the Court must examine the materials on file and the record evidence "in the light most favorable to the nonmoving party."  <u>Samples on Behalf of Samples v. Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988).  When faced with a "properly supported motion for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  <u>Gargiulo v. G.M. Sales, Inc.</u>, 131 F.3d 995, 999 (11th Cir. 1997).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  <u>Evers v. Gen. Motors Corp.</u>, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Some degree of factual dispute is expected, but to successfully counter a

motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S. Ct. at 2510.

## B.   Title IX Retaliation

Title IX, 20 U.S.C. § 1681(a) provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[22]  The Supreme Court has held that Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination, Cannon v. University of Chicago, 441 U.S. 677, 690-93, 99 S.Ct. 1946, 1954-56 (1979), and this right includes actions for equitable relief and monetary damages by private persons, Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 76, 112 S.Ct. 1028, 1038 (1992).  The Supreme Court has further held that Title IX's private right of action includes claims of retaliation against an individual because she complained about sex discrimination.  Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-75, 125 S.Ct. 1497, 1504-05 (2005).

Although the Eleventh Circuit has not yet ruled on the analysis to apply to a Title IX retaliation claim, other courts regularly apply Title VII principles to Title IX

---

[22]There is no dispute that the School Board is a federal funding recipient as defined by 20 U.S.C. § 1681(c) and subject to Title IX's prohibition on intentional sex discrimination.  The School Board also does not dispute that it may be sued for retaliation under Title IX.

discrimination and retaliation claims.  See Emeldi v. University of Oregon, 698 F.3d 715, 724 (9th Cir. 2012); Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 91 (2d Cir. 2011); Lucero v. Nettle Creek School Corp., 566 F.3d 720, 729 (7th Cir. 2009); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002); Preston v. Virginia ex rel. New River Community College, 31 F.3d 203, 206-07 (4th Cir. 1994); Roberts v. Colorado State Board of Agric., 998 F.2d 824, 832 (10th Cir. 1993). See also Ali v. Margate School of Beauty, Inc., 2011 WL 4591878 at * 3 (S.D. Fla. Sept. 30, 2011); Ross v. Corporation of Mercer University, 506 F. Supp. 2d 1325, 1360 (M.D. Ga. 2007) (both applying Title VII analysis to retaliation claims under Title IX). The Court will follow this body of authority and likewise apply to this case those decisions interpreting Title VII retaliation claims.

Thus, to establish a *prima facie* case of Title IX retaliation, the Plaintiffs must show that:  (1) they engaged in protected activity; (2) the School Board took adverse action against them; and (3) the adverse action was a consequence of their protected activities.  See Ross, 506 F. Supp. 2d at 1360, n. 53 (citing Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004)).  See also Jackson, 544 U.S. at 184, 125 S.Ct. at 1510 ("To prevail on the merits, [the plaintiff] will have to prove that the Board retaliated against him *because* he complained of sex discrimination.") (emphasis in original).

**C.**     **Standing**

The School Board first argues that the Plaintiffs do not have standing because they are outside the class of persons Title IX was intended to protect.    More specifically, none of the Plaintiffs were "excluded from participation in, . . . denied the benefits of, or . . . subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. § 1681(a).   In support of this argument, the School Board cites to 16 decisions from other federal courts, each of which held that parents of students lack standing to assert a Title IX claim on the parents' own behalf, because the parents are neither potential beneficiaries of federally funded programs, or employees of such programs.  See Doc. 75, pp. 3-4 (citing cases). However, all but one of these decisions involved claims of Title IX discrimination and/or harassment – they did not involve retaliation claims.[23]

With respect to Title IX retaliation claims, the Court looks to the Supreme Court's holdings in Jackson and Thompson v. North American Stainless, LP, 562 U.S. 170, 131 S. Ct. 863 (2011) for guidance.  In Jackson, the Supreme Court held that a coach had standing to assert a Title IX retaliation claim where he complained of sex discrimination, was retaliated against, but was not the subject of the original discrimination complained of.   544 U.S. 167, 126 S. Ct. 1497.  And in Thompson, a Title VII case, the Supreme Court held that a plaintiff who was fired in retaliation for his

_____

[23]The one retaliation case, Clausen v. National Geographic Society, 664 F. Supp. 2d 1038 (D.N.D. 2009), is directly contradicted by the Supreme Court's Jackson and Thompson decisions.

fiancee filing a charge of sex discrimination with the EEOC, had standing to assert a retaliation claim.  562 U.S. at 177-78, 131 S. Ct. at 869-70.  Thus, applying Jackson and Thompson to this case, it is clear that a person may assert a claim for Title IX retaliation where either (a) the person complained of discrimination and was then subjected to retaliation (even though the complainant was not the subject of the original discrimination); or (b) the person suffered retaliation due to someone else's complaints about discrimination.  In both scenarios, however, the person filing the retaliation claim had to be subject to some injury or harm.

In this case, the Plaintiffs each allege that they either were the complainants who were retaliated against (Mr. Bigge, Mr. Canfield, Mrs. Canfield), the persons suffering retaliation due to others complaints (Mrs. Bigge) or both.  However, there is no evidence that Mrs. Bigge ever made any complaints or engaged in protected activity, nor is there any evidence that she ever suffered any arguably adverse actions.  The two cease and desist letters were directed exclusively to Mr. Bigge and Mr. Canfield (Doc. 32, Ex. E, pp. 12-13, 25-26).  There is no mention of Mrs. Bigge, or reference to family members in either letter.  And, as discussed below, the threatened transfer of Kathryn and Stacey Bigge does not constitute a materially adverse action that can be imputed to their parents to establish a separate retaliation claim.

Thus, the Court finds that Mrs. Bigge lacks standing to assert a Title IX retaliation claim and summary judgment is warranted as to all claims asserted by her.  (Doc. 1,

Count II).[24]  The Court will assume that the remaining Plaintiffs have standing to assert

their Title IX claims of retaliation.  See Dawn L. v. Greater Johnstown School Dist., 586

F. Supp. 2d 332, 376 (W.D. Pa. 2008) ("Retaliation claims are available not only to the

victims of the underlying discrimination; they also 'extend to those who oppose

discrimination against others.'  Although Jackson dealt with the travails of a school

district employee, there is nothing in Jackson or the statute itself that limits the universe

of Title IX retaliation victims to the employees of a funding recipient.[25]  Parents of a

student who have complained of sexual discrimination against that student are

therefore not foreclosed from an action for retaliation.  Claims for retaliation are,

however, only available to those who have actually engaged in a protected activity

themselves; Title IX does not extend this protection to the actor's friends and family.")

(quoting  Jackson, 544 U.S. at 180–81, 125 S.Ct. at 1507) (citations omitted).

## D.    William Bigge's Affidavit

Before the Court addresses the merits of the School Board's motions, there is

one final preliminary matter that must be resolved.  One of the main items of evidence

the Plaintiffs rely upon in their opposition papers is the self-serving affidavit of William

---

[24]Even assuming Mrs. Bigge did have standing to assert her retaliation claim, summary judgment would still be warranted for the reasons stated infra.

[25]But the converse is also true.  The Court is unaware of any Title IX case like this one involving a retaliation claim brought against a public entity with which the plaintiff had no prior privity of some kind.  Hence the Court's assumption for purposes of analysis that the Plaintiffs other than Mrs. Bigge have standing.

Bigge (Doc. 32, Ex. G). Mr. Bigge avers that on May 7, 2013, more than <u>four years</u> after the alleged retaliation, he encountered Steven Richardson, the former Human Resources Director for the School Board, at a restaurant. (<u>Id.</u>, ¶ 18). Mr. Bigge claims that Mr. Richardson told him that the then Superintendent of the Schools, Ms. Himmell, directed Ms. Bradshaw to have Castorina and Eldridge threaten the Plaintiffs with a defamation lawsuit. Mr. Bigge further attests that Mr. Richardson said that the Superintendent also instructed Mr. Richardson to orally notify Ms. Bradshaw to use the Office of Civil Rights complaint against the Plaintiffs as the basis for a lawsuit threat by Castorina and Eldridge, and that the School Board's General Counsel would help the coaches' personal attorney "with the details." Lastly, Mr. Richardson allegedly stated to Mr. Bigge that the School Board had discussions about how to transfer Kathryn and Stacey Bigge to the Sumter County School District, and that the Superintendent made sure that Mrs. Canfield was denied tenure and any other other transfers or promotions. (Doc. 32, Ex. G, ¶¶ 18-19).

The School Board seeks to have this portion of Mr. Bigge's affidavit stricken as inadmissible hearsay, and the Court agrees.[26] The statements in Mr. Bigge's affidavit are being offered for the truth of the matter asserted: that the School Board via Ms. Bradshaw and others was directly involved in the cease and desist letters and engaged

---

[26]The School Board seeks to have the entire affidavit stricken, however the content of the motion is clearly directed only at these portions of the affidavit, as well as another portion concerning Mr. Bigge's involvement in the 2011 case. The Court will refrain from striking the entire affidavit.

in a pattern of retaliation against the Plaintiffs.  The statement of Mr. Richardson to Mr. Bigge is clearly hearsay in the absence of any predicate that Mr. Richardson was authorized by the School Board to make the statement at the time it was made.  See Fed. R. Evid. 801(d)(2)(C) and (D).  Such "inadmissible hearsay cannot be considered on a motion for summary judgment."  Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999).  Moreover, these hearsay statements cannot be reduced to admissible form – both Ms. Bradshaw and Mr. Richardson have given deposition testimony in which they directly contradicted all of the statements contained in Mr. Bigge's affidavit. See Doc. 41, Ex B., Doc. 54, Ex. E.  See also Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("'[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.' . . .   If, however, the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement, we may not consider the hearsay statement at the summary judgment phase.") (quoting Macuba, 193 F.3d at 1323).

The Plaintiffs argue that Mr. Bigge's affidavit is not hearsay because it includes statements by a party opponent under Fed. R. Civ. P. 801(d)(2).  However, at the time Mr. Richardson allegedly made these statements[27] he was no longer employed by the

_____

[27] Mr. Richardson testified at his deposition that he did not know who Mr. Bigge was, and never discussed any School Board matters or anything else with Mr. Bigge.  (Doc. 41, Ex. B, pp. 10-14).

School Board – he had retired in June 2009 (Doc. 41, Ex. B., p. 5) – thus his statements cannot be considered an admission by a party opponent. <u>See</u> Fed. R. Evid. 801(d)(2)(D) (to be admissible, the statement must be offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship <u>and while it existed</u>").[28] Moreover, the Plaintiffs have not shown "that an otherwise excludible statement relates to a matter within the scope of the agent's employment." <u>Wilkinson v. Carnival Cruise Lines, Inc.</u>, 920 F.2d 1560, 1566 (11th Cir. 1991). As the proffering parties, the Plaintiffs must show that Mr. Richardson's statements concerning the cease and desist letters, the attempt to transfer the students, and/or Mrs. Canfield's tenure decisions relate to matters within the scope of his then-employment. The Plaintiffs have failed to do so.[29]

The Plaintiffs also argue that the state of mind hearsay exception in Fed. R. Civ. P. 803(3) applies to Mr. Bigge's affidavit. The state of mind exception to the hearsay rule provides that statements can be admitted to establish "the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional sensory, or physical

---

[28]The Plaintiffs also have not identified whether any other persons mentioned in Mr. Bigge's affidavit remain employed by the School Board, or explained how these hearsay statements were made within the scope of their employment.

[29]While not entirely clear, it appears that the Plaintiffs are also arguing that Mr. Richardson's statements are admissible as a statement made by a co-conspirator during and in furtherance of the conspiracy. <u>See</u> Fed. R. Evid. 801(d)(2)(E). The Court is at a loss to see how statements made by a former employee to an alleged victim more than <u>four years</u> after the purported conspiracy concluded, were made "during and in furtherance of the conspiracy." The Plaintiffs' bald assertion fails.

condition (such as mental feeling, pain, or bodily health)." However, the exception specifically renders inadmissible "a statement of memory or belief to prove the fact remembered or believed. . . ." Fed. R. Evid. 803(3). In this case, there can be no other use for Mr. Richardson's statements other than to prove the facts as he purportedly remembers them. Moreover, the Plaintiffs have not argued, nor presented any evidence, suggesting that Mr. Richardson's state of mind is a relevant issue in this case. See T. Harris Young & Assocs., Inc. V. Marquette Electronics, Inc., 931 F.2d 816, 828 (11th Cir. 1991) ("Before a statement can be admitted under Rule 803(3) to show the declarant's then existing state of mind, the declarant's state of mind must be a relevant issue."). See also United States v. Samaniego, 345 F.3d 1280, 1282 (11th Cir. 2003) ("[W]e have explained that the purpose of the exclusion from Rule 803(3) admissibility is 'to narrowly limit those admissible statements to declarations of condition - 'I'm scared' - and not belief 'I'm scared because [someone] threatened me.'") (quoting United States v. Cohen, 631 F.2d 1223, 1225 (5th Cir. 1980)).

The portions of Mr. Bigge's affidavit relating to his purported discussions with Mr. Richardson will be stricken and will not be considered in addressing the School Board's motions for summary judgment.[30]

---

[30]The School Board also seeks to strike portions of Mr. Bigge's affidavit relating to whether or not he retained and paid for legal counsel that represented his daughters in the 2011 case, and whether he considered himself a client protected by attorney-client privilege in that case. (Doc. 32, Ex. G, ¶¶ 13-14). The Court finds that these averments do not directly contradict Mr. Bigge's deposition testimony in the 2011 case, and therefore will not be stricken. See Van T. Junkins and
(continued...)

## E.      The Cease and Desist Letters

Turning to the merits of the School Board's motions, they first challenge the Plaintiffs' claims of retaliation relating to the January 28, 2009 cease and desist letters sent by Castorina's and Eldridges' private attorney, Ms. Gaffney.  The School Board argues that Castorina and Eldridge acted in their capacity as private individuals, who hired a private attorney, to potentially pursue a private lawsuit against Mr. Bigge and Mr. Canfield.  The coaches were not acting as agents of the School Board and, therefore, their actions cannot be imputed to the School Board as a retaliatory threat.

The evidence in this case – or rather the lack of evidence – strongly supports the School Board's position.  There is no admissible record evidence from which a reasonable jury could infer that anyone representing the School Board ever spoke to Ms. Gaffney, retained her services, drafted and/or reviewed the cease and desist letters, or were otherwise involved in the coaches' representation by Ms. Gaffney.  The Plaintiffs also have not argued or presented evidence that the School Board could itself sue the Plaintiffs for slander or defamation, or could have prevented the coaches from pursuing such a private cause of action.  More importantly, the Plaintiffs have not argued or demonstrated how Castorina's and Eldridges' private actions in hiring an attorney and sending the cease and desist letters could be considered within the scope

_____

[30](...continued)
Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984); Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986).

-32-

of their agency as then employees of the School Board.  Simply put, this is a situation where two <u>private</u> individuals engaged the services of an attorney, to pursue a lawsuit <u>on their own behalf</u>.  It defies logic that such private actions could be considered retaliation on the part of the School Board.

The Plaintiffs attempt to rescue this claim by referencing three pieces of evidence: (1) the portions of Mr. Bigge's affidavit discussing his purported 2013 conversation with Mr. Richardson; (2) the December 2, 2008 email from Eldridge to his wife; and (3) the January 26, 2009 email from Castorina to Eldridge.  The portions of Mr. Bigge's affidavit have been stricken as inadmissible hearsay and cannot be considered further.  The two emails suffer the same fate.[31]

The December 2, 2008 email from Eldridge to his spouse details a purported conversation Eldridge had with Castorina, in which Castorina relays a conversation <u>he</u> had with Ms. Bradshaw about hiring an attorney to pursue a defamation lawsuit (Doc. 54, Ex. C).  The email is being offered for the truth of the matter asserted – that Ms. Bradshaw directed Castorina to hire an attorney and pursue litigation against the Plaintiffs.  Moreover it is hearsay within hearsay: (1) the purported statement by Ms. Bradshaw to Castorina; and (2) the purported statement by Castorina to Eldridge.  The Plaintiffs have not shown that either Ms. Bradshaw's or Castorina's statements (*i.e.* offering legal advice)  were made within the course and scope of their employment with

---

[31]It should be noted that none of the coaches were made parties to this action, nor were they parties in the 2011 litigation.

the School Board; therefore their statements cannot be considered admissible statements of a party opponent.  See Fed. R. Evid. 802(d)(2)(D); Wilkinson, 920 F.2d at 1566.  The statements are also not capable of being reduced to admissible form, as both Ms. Bradshaw and Castorina have testified in their respective depositions that they never made any of the statements alluded to in the December 2, 2008 email. See Doc. 54, Ex. B, pp. 15-18; Ex. E, pp. 29, 63.  See also Jones, 683 F.3d 1283, 1293-94.

 The Plaintiffs' reliance on the January 26, 2009 email between Castorina and Eldridge is even more tenuous.  In that email, Castorina stated that Ms. Bradshaw "suggested that Karen call Wes to see if we can use the Office of Civil Rights as ammo against Bigge and Canfield."  (Doc. 54, Ex. F).  It would stretch all logical boundaries to infer from this lone statement that the School Board was directing Castorina's and Eldridges' private litigation against the Plaintiffs.  Moreover, this email is also hearsay – as again, the Plaintiffs have failed to present any evidence that this purported statement by Ms. Bradshaw was made within the scope of her employment with the School Board, and Ms. Bradshaw has testified at her deposition that she never made any such statement.

 The Plaintiffs argue that these emails should be admissible under Fed. R. Evid. 802(d)(2)(E) as being made by a coconspirator during and in furtherance of a conspiracy. In order for Rule 802(d)(2)(E) to apply, the Plaintiffs must present evidence that: (1) a conspiracy existed; (2) the conspiracy included the declarant and the

defendant against whom the statement is offered; and (3) the statement was made during the course of an in furtherance of the conspiracy.  See United States v. Underwood, 446 F.3d 1340, 1345-46 (11th Cir. 2006).  Although Plaintiffs' counsel makes numerous bald and inflammatory assertions of a vast conspiracy between nearly every member of the Citrus County School District, the Plaintiffs have not supported these assertions with any admissible evidence.  Indeed, the only mention of a conspiracy not made by Plaintiffs' counsel rests in the previously stricken portions of Mr. Bigge's affidavit.  The emails are thus hearsay and cannot be considered in support of the Plaintiffs' claim.

Even if the emails were not inadmissible hearsay, the content of the emails simply does not create a material issue of fact sufficient to defeat summary judgment. At most, these emails show Ms. Bradshaw suggesting that Castorina and Eldridge consult with a private attorney.  There is no other evidence in this case – and the Parties have had more than enough time to locate such evidence if it existed – that anyone at the School Board did anything more than this.  There is no evidence that the School Board counseled spiteful or vexatious litigation, and to hold that the mere suggestion to seek legal counsel equates to a materially adverse action to support a retaliation claim does not find any precedential support.  To the contrary, advising persons to consult a lawyer and utilize the legal system during a period of conflict is clearly preferable to allowing persons to engage in activities that could dramatically escalate the conflict into injurious conditions.  In sum, referring two private persons to

an attorney is not an adverse action for which the Plaintiffs can pursue a Title IX retaliation claim, and no reasonable jury could think otherwise. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006) (Title VII retaliation does not set forth "a general civility code," and does not protect against "petty slights, minor annoyances, and simple lack of good manners.").

Summary judgment will be granted in favor of the School Board as to the Plaintiffs' retaliation claims relating to the cease and desist letters.[32]

## F.   The Threatened Transfer of Kathryn and Stacey Bigge

Mr. and Mrs. Bigge have also asserted a retaliation claim based on the February 13, 2009 letter from Ms. Bradshaw notifying them that Kathryn and Stacey were being transferred to the Sumter County School District.  The School Board contends that it is entitled to summary judgment on this portion of the Bigges' claim because the threatened transfer had some basis in fact and, since the transfer never occurred, does not constitute an adverse action.  The Court agrees.

The February 13, 2009 letter was just that – a letter.  It had no effect, as it is undisputed that as soon as Mr. Bigge presented Ms. Bradshaw with proof that the

---

[32]The School Board also argues that the Plaintiffs' claims concerning the cease and desist letters are time barred.  The letters are dated January 28, 2009, and the Plaintiffs filed their Complaint in this Court on January 29, 2013.  The Parties agree that a four year statute of limitations applies to the retaliation claims, see Fla. Stat. § 95.11(3).  However, the day of the event triggering the limitations period is not counted, and the School Board has not established that the Plaintiffs in fact received these letters on January 28, 2009.  Thus, the Court finds that the Plaintiffs' claims are not time barred.

students lived within the geographical confines of the Citrus County School District, the transfer was rescinded.  It is further undisputed that Kathryn and Stacey were never transferred to another school, and were never prohibited from attending Citrus High School.  Simply put, nothing ever happened to the Bigges or to their daughters.  Based on these undisputed facts, the Court finds as a matter of law that the threatened transfer of the Bigges' daughters does not equate to an adverse action for purposes of a Title IX retaliation claim.  See Burlington, 548 U.S. at 67, 126 S. Ct. at 2414 ("The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm."); Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010) (holding that a phone call threatening plaintiff's job did not rise to an adverse employment action because "nothing suggests, nor does [plaintiff] argue . . . that [defendant] took any action . . . that could have seriously affected [plaintiff's] employment."); Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) ("The asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.").[33]

_____

[33]The Plaintiffs mistakenly rely on this Court's order in the 2011 case granting in part and denying in part the School Board's motion to dismiss.  See the 2011 case, Doc. 26.  In that case, the Court cited to Burlington and held that the February 13, 2009 threat to transfer Kathryn and Stacey Bigge was "sufficient to arguably constitute an adverse action for purposes of establishing a Title IX prima facie case and surviving a motion to dismiss."  (Id., p. 13).  As the quote makes clear, the Court was addressing a motion to dismiss under the standards of Fed. R. Civ. P. 12(b)(6) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), without the benefit of a fully developed factual record.  Here, the Court is addressing motions for summary judgment under the Fed. R. Civ. P. 56 standard.  Moreover, the 2011 case involved claims asserted by the students who would actually be forced to transfer schools – i.e., the parties directly injured by the

(continued...)

Even if the threat to transfer Kathryn and Stacey Bigge could be considered an adverse action, it cannot be imputed to their parents.  The only parties who would possibly suffer a compensable injury as a result of the February 13, 2009 transfer letter are Kathryn and Stacey Bigge – the students who would have been transferred to another school.  Further, as discussed above, in order to pursue a Title IX retaliation claim, the plaintiff must have either complained and suffered harm as a result, or suffered harm as the result of another persons' complaints.  The Court is unaware of any decision in any federal court where a person could successfully pursue a retaliation claim where the subject of the alleged retaliation was not the victim of any harm or injury (and the Plaintiffs have not cited to any such authority).  To the contrary, it would appear that the case law weighs against the Plaintiffs.  See e.g., Jones v. Beverly Hills Unified School Dist., 2010 WL 1222016, at *4 (C.D. Cal. Mar. 24, 2010) (dismissing parent's Title IX retaliation claim because the claim was "based on retaliation directed at her daughter, not her, i.e., [daughter] did not make the girls' basketball team because [parent] complained.").  Kathryn and Stacey Bigge, the only persons who could arguably assert a claim based on the transfer letter, have already had their day

_____

[33](...continued)
purported retaliation.

-38-

in court.  Summary judgment will be granted as to this portion of the Bigges' retaliation claims.[34]

## G.    Laurie Canfield

Lastly, the School Board seeks summary judgment on Mrs. Canfield's claims that the School Board retaliated against her by delaying her tenure and/or a professional services contract for one year, and denying her the art teacher position at Inverness Primary School.  Mrs. Canfield concedes that "the law appears to favor the granting" of the School Board's motion with respect to the denial of the Inverness Primary School teaching position (Doc. 65).  Summary judgment will therefore be granted as to that portion of Mrs. Canfield's retaliation claim, and the Court will limit its focus to her claim regarding the delay in awarding her tenure and/or a professional services contract.

The School Board seeks summary judgment because there is no evidence that this delay in granting tenure and/or a professional services contract constitutes an adverse action and because the delay is not causally related to her complaints concerning her daughter's participation on the soccer team.  On the first point, the School Board references Mrs. Canfield's deposition testimony in the 2011 case, in which she stated that the denial of tenure and/or professional services contract in the 2008-2009 school year did not result in any loss of pay, or loss of any other benefits.

---

[34]The Court is aware that Mrs. Bigge avers in her affidavit that she was "emotionally traumatized" by the February 13, 2009 letter.  However, it bears repeating that the persons who would have a claim related to that letter – if it had gone into effect – were her daughters.

(Doc. 7, Ex. 3, pp. 52-53).  However, the Eleventh Circuit has previously held that in the Title VII retaliation context "tenure-related decisions affect an important term of employment for an university professor.  They are adverse employment actions." Gillis v. Georgia Dept. of Corrections, 400 F.3d 833, 887 (11th Cir. 2005) (quoting Gupta v. Florida Board of Regents, 212 F.3d 571, 590 (11th Cir. 2000)).  To be sure, a charter school is not a university, but the rationale of Gillis is persuasive, and the Court therefore finds that there is at least a material question of fact as to this issue.

The School Board's argument concerning a causal relationship is much more persuasive.  Mrs. Canfield testified at her deposition that her principal, Mr. Stofcheck, was the sole person in charge of recommending employees for tenure and/or a professional services contract.  (Doc. 7, Ex. 3, pp. 30).  Mrs. Canfield further testified that she never had any conversations with Mr. Stofcheck about her complaints concerning the Citrus High School soccer team.  (Id., at pp. 29-30).  She also has not submitted any admissible evidence suggesting that Mr. Stofcheck was aware of her complaints, or that his decision not to recommend her for tenure and/or a professional services contract in the 2008-2009 school year related in any way to her complaints. (Id., at 30-31).[35]  See Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1278 (11th Cir. 2008) ("[T]he plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (quoting

---

[35]The only evidence Mrs. Canfield relies upon is the previously stricken portions of Mr. Bigge's affidavit.

Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000)); Walton-Horton v. Hyundai of Alabama, 402 Fed. Appx. 405, 409 (11th Cir. Oct. 21, 2010) (finding no causal connection between plaintiff's complaints and her termination where person who recommended her discharge had no knowledge of the plaintiff's complaints at time the recommendation was made).  Moreover, the undisputed facts show that as soon as Mr. Stofcheck did recommend her for tenure and/or a professional services contract at the end of the 2009-2010 school year, the School Board approved the recommendation.

Further supporting the School Board's position is the fact that approximately five to six months passed between the time Mrs. Canfield engaged in protected activity (the December 4, 2008 complaint to the School and the January 26, 2009 complaint to the Department of Education) and the denial of tenure (the end of the 2008-2009 school year - approximately June 2009).  The lack of close temporal proximity, without more, is fatal to Mrs. Canfield's claim.  See e.g., Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (finding that a three-to-four month period between the protected activity and the adverse employment action is not enough to establish a causal link because "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."); Manley v. DeKalb County, Georgia, 587 Fed. Appx. 507, 513 (11th Cir. Sept. 3, 2014) (six month delay between plaintiff's internal complaint and suspension from job were not in "very close" temporal

proximity to establish a causal connection); <u>Webb-Edwards v. Orange County Sheriff's Office</u>, 525 F.3d 1013, 1029 (11th Cir. 2008) (interval of six months between plaintiff's sexual harassment complaint and denial of transfer was insufficient, by itself, to show causality element of Title VII retaliation claim due to a lack of very close temporal proximity).

Summary judgment will be granted as to Mrs. Canfield's retaliation claim (Doc. 1, Count IV).[36]

## **Conclusion**

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)     The Defendant, District School Board of Citrus County, Florida's Motion to Dismiss Complaint or to Strike Paragraphs (Doc. 6), which the Court has treated as a motion for summary judgment (<u>see</u> Doc. 11) is GRANTED;

(2)     The School Board's Amended Motion to Strike Affidavit of Plaintiff William Bigge (Doc. 41) is GRANTED IN PART AND DENIED IN PART.  Paragraphs 18-19 of Mr. Bigge's affidavit (Doc. 32, Ex. G) are STRICKEN.  In all other respects, the motion to strike is DENIED;

(3)     The School Board's Motion for Partial Summary Judgment on Plaintiffs' Claim that Cease and Desist Letters Constituted Retaliation (Doc. 54) is GRANTED;

---

[36]Because the Court finds that the School Board is entitled to summary judgment on all claims, and because the Court has previously stated that the Plaintiffs were not parties to the prior 2011 litigation, the Court will not further address the School Board's res judicata argument.

(4)     The School Board's Amended Motion for Partial Summary Judgment on Plaintiffs' Claim that Laurie Canfield Was Not Hired for Position at Inverness Primary School Was Retaliation (Doc. 58) is GRANTED; and

(5)     Plaintiffs' Motion to Strike Defendant's Motion for Summary Judgment, or in the Alternative, Plaintiffs' Motion for Leave to Supplement Their Opposition to Defendant's Motion for Summary Judgment (Doc. 81) is DENIED.

(6)     The Clerk is directed to enter judgment dismissing without prejudice the Plaintiffs' intentional infliction of emotional distress claims (Doc. 1, Counts V-VIII).  The Clerk is also directed to enter judgment in favor of the Defendant, District School Board of Citrus County, Florida and against the Plaintiffs as to all remaining claims (Doc. 1, Counts I-IV).  Upon the entry of judgment, the Clerk shall terminate all other pending motions and close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 13th day of March, 2015.

UNITED STATES DISTRICT JUDGE

Copies to:     Counsel of Record
               Maurya McSheehy